Page 1

1    IN THE CIRCUIT COURT OF THE CITY OF ST. LOUIS
            STATE OF MISSOURI
2
     KENNETH ROHRBOUGH,                          )
3                                                )
     Plaintiff,                                  )
4                                                ) Cause No.
     vs.                                         ) 042-08044
5                                                )
     P.O. LUTHER HALL, et al,                    )
6                                                )
     Defendants.                                 )
7

8

9       DEPOSITION OF OFFICER LUTHER HALL, JR.

10

11         Taken on behalf of the Plaintiff
                October 12, 2005
12
           Pamela G. Williams, CCR 880

EXHIBIT A

Page 2

| | QUESTIONS BY: | PAGE NO. |
|---|---|---|
| | Mr. Ryals | 5 |

INDEX OF EXHIBITS

| PLAINTIFF'S NO. | | PAGE MKD. |
|---|---|---|
| 1 | Copy of Police Report | 30 |
| 2 | Copy of Disposition Report | 30 |
| 3 | Summons | 30 |
| 4-16 | Photographs of Mr. Rohrbough | 38 |
| 17 | Photograph of sidewalk | 48 |
| 18 | Hand drawn sketch by Mr. Hall | 69 |

Page 4

A P P E A R A N C E S

For the Plaintiff:
Mr. Stephen Ryals
The Ryals Law Firm
8008 Carondelet, Suite 205
St. Louis, Missouri 63105
(314) 862-6262

For the Defendant:
Mr. Joseph T. McGuire
Assistant Attorney General
720 Olive Street, Suite 2150
St. Louis, Missouri 63101

The Court Reporter:

Ms. Pamela G. Williams
Midwest Litigation Services
711 North Eleventh Street
St. Louis, Missouri 63101
(314) 644-2191

Page 3

IN THE CIRCUIT COURT OF THE CITY OF ST. LOUIS
STATE OF MISSOURI

KENNETH ROHRBOUGH,         )
                           )
    Plaintiff,             )
                           )
vs.                        ) Cause No.
                           ) 042-08044
                           )
P.O. LUTHER HALL, et al,   )
                           )
    Defendants.            )

         DEPOSITION OF WITNESS, OFFICER LUTHER HALL, JR., produced, sworn, and examined on the 12th day of October, 2005, between the hours of ten o'clock in the morning and twelve o'clock noon of that day, at the office of Mr. Joseph T. McGuire, Assistant Attorney General, 111 N. 7th Street, St. Louis, Missouri, before PAMELA G. WILLIAMS, a Notary Public and Certified Court Reporter within and for the State of Missouri, in a certain cause now pending before the Circuit Court of the County of St. Louis in the State of Missouri, wherein KENNETH ROHRBOUGH, is the Plaintiff, and LUTHER HALL, JR, et al. are the Defendants.

Page 5

         IT IS HEREBY STIPULATED AND AGREED, by and between counsel for Plaintiff and counsel for Defendants, that the deposition of OFFICER LUTHER HALL, JR, may be taken in shorthand by Pamela G. Williams, a notary public and shorthand reporter, and afterwards transcribed into typewriting; and the signature of the witness is expressly requested.
                    * * * * *
         LUTHER HALL, JR.,
of lawful age, being produced, sworn and examined on behalf of the Plaintiff, deposes and says:
         [EXAMINATION]
QUESTIONS BY MR. RYALS:
    Q    State your name, please.
    A    Luther Hall, Jr.
    Q    Where are you employed, sir?
    A    City of St. Louis.
    Q    In what capacity?
    A    Detective.
    Q    With the St. Louis Metropolitan Police Department?
    A    Correct.
    Q    Have you ever given your deposition before?
    A    No.
    Q    Testified in court?

Page 6

1  A  Yes.
2  Q  Okay. There are really no rules but there's
3  some guidelines that we like to talk about when we do a
4  deposition. One is your responses have to be verbal and
5  rather than uh-huh or huh-uh, say yes or no so the court
6  reporter can take it down, okay?
7  A  Yep.
8  Q  The other is we should try not to talk over
9  each other because the court reporter can't down two
10 conversations at once. And the last thing is if I ever ask
11 you a question that you don't understand, that is in any
12 way unclear to you, I would ask you to stop me and have me
13 rephrase it or otherwise clarify it. Because if you answer
14 a question I'm going to assume you understood it, okay?
15 A  Okay.
16 Q  Your present assignment is as a detective; is
17 that right?
18 A  Correct.
19 Q  And are you just, I don't know what the
20 classifications are, are you a general detective or do you
21 focus on a particular --
22 A  Intelligence Division.
23 Q  I got you. Is that in headquarters?
24 A  Correct.
25 Q  How long have you done that job?

Page 7

1  A  Two and a half years.
2  Q  Is your rank still patrol officer?
3  A  Sure, yes.
4  Q  Not sergeant or?
5  A  No.
6  Q  Okay. Was that an assignment that you sought
7  or were you selected for that?
8  A  Selected.
9  Q  Was it a competitive selection process?
10 A  Yes.
11 Q  What was the competition like? I mean did you
12 have to take an exam or have an oral board or something?
13 A  Oral board.
14 Q  Before who?
15 A  The commander of the unit.
16 Q  Who's that?
17 A  At the time it was Richard Trevor.
18 Q  Okay.
19 A  And a representative from the chief's office.
20 Q  Who's the commander now?
21 A  Lieutenant Mike Jarvis.
22 Q  Without going into gory detail what does that
23 assignment entail working as a detective in the
24 intelligence division?
25 A  Part of it is handling all the asset

Page 8

1  forfeiture cases which come through the department. And
2  just various projects that come through.
3  Q  From -- When you go from a patrol officer to a
4  detective is that considered a promotion of sorts?
5  A  No, as far as pay or anything no, it's not.
6  Q  How about in the eyes of the person -- I mean
7  in your eyes was it a promotion or is it just purely
8  lateral move?
9  A  It's pretty much a lateral move.
10 Q  Okay. Besides that asset forfeiture what else
11 does your office do?
12 A  We handle just different projects that come
13 along. A lot of it's projects the chief's office hands
14 down to our lieutenant.
15 Q  Can you gave me some examples?
16 A  Probably not. I mean anything that the
17 chief's office feels that has to be investigated goes
18 through the intelligence division.
19 Q  Prior to going into the intelligence division
20 what were your assignments?
21 A  I spent three years in the asset forfeiture
22 office before detached and then I was a patrol officer in
23 south patrol division, District Three or overlay which
24 pretty much was sort of a weed and seed unit. We spent
25 most of our time doing search warrants, things like that.

Page 9

1  Neighborhood narcotics and weapons.
2  Q  I'm a little unclear on the chronology. Let's
3  take it back. When did you first become a police officer?
4  A  Ninety-five.
5  Q  Your first assignment was patrol?
6  A  Correct.
7  Q  In the Third?
8  A  Correct.
9  Q  South part of the third, right? South
10 division?
11 A  Right.
12 Q  How long did you do that job?
13 A  About two and a half years.
14 Q  Your next assignment?
15 A  I was detached to the asset forfeiture unit.
16 Q  For how long then?
17 A  Approximately three years.
18 Q  Was that uniform work or plain clothes?
19 A  Plain clothes.
20 Q  Were you considered a detective?
21 A  Yes.
22 Q  That takes us roughly to 2000, right?
23 A  Yes. 2000, 2001.
24 Q  Okay. And what was your next assignment?
25 A  I went back to the Third District under their

Page 10

1  overlay unit.
2  Q    And that's what we were talking about, the
3  weed and seed program?
4  A    Correct.
5  Q    Was that your exclusive assignment when you
6  went back to the Third?
7  A    No.
8  Q    The overlay unit?
9  A    No, I went back just as a patrol officer but
10 when I got back the lieutenant over the weed and seed unit
11 used my partner and I for probably 90 percent of their
12 projects.
13 Q    Did that comprise 90 percent of your work
14 time?
15 A    Most of our work time was writing search
16 warrants, guns, drugs, things like that. Street arrests.
17 Q    Still in the south division of the Third?
18 A    I'm sorry?
19 Q    Still in the south division?
20 A    Correct. Actually pretty much the whole south
21 end of the city. We actually did go into the other
22 districts First and Second also.
23 Q    And you did that until you went into the
24 intelligence unit?
25 A    Correct.

Page 11

1  Q    And that was how many years?
2  A    '03 I guess.
3  Q    So 2000, 2001, till 2003?
4  A    Correct.
5  Q    Was that uniform work or plain clothes?
6  A    Uniform. We sometimes we were in plain
7  clothes but majority of the time it was uniform.
8  Q    Like if you're doing a warrant or something
9  like that you might be in plain clothes?
10 A    Or surveillance, correct.
11 Q    So that would have been your assignment in
12 September of 2002?
13 A    Correct.
14 Q    Did you apply for all of these changes in
15 assignments or did they just happen whether you applied or
16 not?
17 A    They were all -- I didn't apply for any of
18 them. They were all sort of was called in either by the
19 chief's office or someone had asked me. Sort of asked to
20 do them.
21 Q    Have you ever applied for promotion?
22 A    No.
23 Q    Have you receive any commendations, medals,
24 awards?
25 A    Chief's letter, officer of the month or

Page 12

1  something like that. A couple other things, I'm not sure
2  exactly what they were. It was a while ago.
3  Q    The couple of other things you just made
4  reference to, would they be lesser attaboys than the
5  chief's letter, for example?
6  A    Yeah, I think they were.
7  Q    Have you received any discipline as a police
8  officer?
9  A    Written reprimand.
10 Q    What was that for?
11 A    In failing to return a radio in time or
12 something like that.
13 Q    A police radio?
14 A    Uh-huh.
15 Q    Yes?
16 A    Yes.
17 Q    Return it to whom?
18 A    Just to the bunker in the station.
19 Q    Did you take it home with you or something?
20 A    Yeah, we got off work and I took it home with
21 me instead of leaving it in the bunker or something.
22 Q    Are you aware of any citizen complaints that
23 have been lodged against you?
24 A    No.
25 Q    Have you ever worked as a police officer

Page 13

1  anywhere else?
2  A    No.
3  Q    So you went to the St. Louis Metropolitan
4  Police Department Academy?
5  A    Correct.
6  Q    On September 3rd of 2002 were you on duty?
7  A    No.
8  Q    You had an encounter with Kenneth Rohrbough
9  that day?
10 A    Correct.
11 Q    Are you familiar with the allegations in the
12 lawsuit that's been filed?
13 A    Yes.
14 Q    Before you encountered Mr. Rohrbough what were
15 you doing?
16 A    Right before or that day or?
17 Q    Well, let's answer -- please answer the more
18 narrow of those right before?
19 A    Okay. Exiting my -- exiting a marked police
20 vehicle.
21 Q    How about that day?
22 A    I went to a funeral for an officer that was
23 killed in the line of duty.
24 Q    Which officer was that?
25 A    Mike Barrawick.

Page 14

1  Q  Killed in an automobile --
2  A  Correct.
3  Q  -- collision?  Were you in uniform?
4  A  Yes.
5  Q  Was anybody in the vehicle with you?
6  A  Anna Kimble.
7  Q  Who is she?
8  A  My partner.
9  Q  She was your partner at that time?
10  A  Correct.
11  Q  Was she on duty?
12  A  No.
13  Q  Can you explain if you were off duty why you
14 were in a marked police vehicle?
15  A  Because we went to the funeral.  We used a
16 marked police vehicle to go to the funeral.
17  Q  That's not unusual?
18  A  No.
19  Q  Now the area where this occurred is -- roughly
20 2800 North 14th, that's in St. St. Louis, correct?
21  A  Correct.
22  Q  Is that part of your assigned beat?
23  A  No.
24  Q  What were you doing in that area?
25  A  Going to eat lunch.

Page 15

1  Q  At Crown Candy?
2  A  Correct.
3  Q  To your knowledge at the time you arrived in
4 the vicinity of Crown Candy Kitchen were you the only two
5 police officers in the area?
6  A  I have no knowledge of that.
7  Q  You didn't see any other police officers?
8  A  No.  Well, you said in the area so in the
9 block or in the area?  Where we were as far as we could
10 see, no, there was no other police officers.  But in that
11 area there could have been a car a block away or --
12  Q  That you couldn't see?
13  A  Sure.
14  Q  I should -- The question was unclear.  I'm
15 talking about that you could see.
16  A  Right.  No, we were the only two officers.
17  Q  When you discussed going to Crown Candy
18 Kitchen did you talk about joining any other officers there
19 or was it just you and Officer Kimble?
20  A  Just Officer Kimble and I.
21  Q  Who was driving?
22  A  I think I were.  I was driving.
23  Q  What was the first -- What was the first event
24 that drew your attention to Mr. Rohrbough?
25  A  The lady from the optometrist shop came out

Page 16

1 and basically pointed him out to us.
2  Q  Did you know there was anything at issue
3 before she came out and pointed him out?
4  A  No.
5  Q  So the first indication you have is you hear
6 her or see her come out of the optometrist shop?
7  A  Correct.
8  Q  Where were you at when she came out?
9  A  We parked our vehicle if I'm not mistaken
10 directly next to the building, exited the vehicle and she
11 came out the front door of the shop directly toward us.
12  Q  What's the -- Do me a favor if you would.
13 Would you draw the layout of the streets in the vicinity
14 where you were at?  In other words, show where the
15 optometrist shop was.  Show the street where you parked.
16 Show Crown Candy.
17  A  If I'm not mistaken the optometrist shop is
18 here, Crown Candy is here.  I think our police car was
19 parked here.
20  Q  All right.  Which -- Can you draw an arrow
21 showing which direction it was parked?  All right.  And the
22 street that you were parked on is which street?
23  A  I'm not sure which street this is.  This is
24 St. Louis Avenue here.  This is 14th so I'm assuming that's
25 13th.  I'm not sure.

Page 17

1  Q  Okay.  What direction were you parked?
2  A  North.
3  Q  Where's the door that the woman from the
4 optometrist shop exited?  Is it --
5  A  I think it's here on the corner.
6  Q  On the corner?
7  A  Uh-huh.
8  Q  Were you out of the car when she came out when
9 you first noticed her?
10  A  Yes.
11  Q  And had you moved toward Crown Candy at that
12 point?
13  A  I think actually we were just locking the door
14 of the car just exiting the vehicle when she came out.
15  Q  And she said something to you; is that
16 correct?
17  A  Yes.
18  Q  What did she say?
19  A  Like basically this gentleman had just
20 destroyed some equipment or I'm trying to think of the
21 exact words she used -- in her office.
22  Q  Did she refer to him as a gentleman?
23  A  I'm not sure.
24  Q  Do you recall what she said?
25  A  Guy or I mean she could have, you know, I'm

Page 18

1 not sure exactly what she called him.
2     Q   All right.  Did she say anything else besides
3 a guy or a person had just destroyed equipment in her
4 office?
5     A   I can't remember.
6     Q   Did she identify anybody?
7     A   Well, she pointed to the gentleman walking
8 away from the optometrist shop.
9     Q   What street was he on?
10    A   St. Louis Avenue.
11    Q   Which direction was he heading?
12    A   He was headed east.
13    Q   So that would have been away from Crown Candy?
14    A   Correct.
15    Q   How far away was he when you first saw him?
16    A   I don't know, maybe an eighth of a block from
17 here but those are small blocks so not sure.
18    Q   Did you perceive that some offense had
19 occurred that required police attention?
20        MR. MCGUIRE:  Objection, vague.  What type of
21 offense?
22    Q   (By Mr. Ryals) Some violation of the law?
23    A   Yeah.
24    Q   Which was?
25    A   Well, if he destroyed something that's

Page 19

1 destruction of private property.
2     Q   Okay.  Anything else at that moment?
3     A   At that moment, no, I mean I didn't stop to
4 interview her.
5     Q   What did you do?
6     A   I went after or ran after the suspect or the
7 gentleman to talk to him to find out what had occurred.
8     Q   So at this point he's a block away?
9     A   No, he's not a block away.
10    Q   Oh, I misunderstood.
11    A   I said an eighth of a block.
12    Q   I'm sorry.  I misunderstood you.  So very
13 close; is that right?
14    A   Close enough, yeah.
15    Q   Could he hear -- I mean was he close enough
16 that it was your perception that if you yelled at him he
17 would be able to hear you?
18    A   Not sure.
19    Q   Did you yell at him?
20    A   I think as I approached him I might have
21 yelled at him.  I said, you know, police officer or I'm not
22 sure.
23    Q   But you moved toward him before you said
24 anything to him?
25    A   Yes.

Page 20

1     Q   Did you stop to examine the scene, that is,
2 inside the office where the woman said there had been
3 damage?
4     A   No.
5     Q   Did you hear Officer Kimble say anything up
6 until this point in the narrative?
7     A   No.
8     Q   Did you see her movements?
9     A   No.
10    Q   Was it your perception that you pursued this
11 gentleman alone or was she accompanying you?
12    A   I pursued him alone.
13    Q   You know that for certain she didn't go with
14 me?
15    A   Yeah, normally someone would stay with the
16 victim.
17    Q   When you approached him was his back to you?
18    A   Yes.
19    Q   How close were you when you said the first
20 thing that you said to him?
21    A   I'm not sure.  Maybe ten, twelve feet.
22    Q   Farther than you could reach out and touch
23 him --
24    A   Correct.
25    Q   -- is that accurate?  All right.  And I think

Page 21

1 before you said that you ran after him.  Is that literally
2 true you?
3     A   It wasn't a full out run, a sprint.  I mean it
4 was sort of a, you know, jog.
5     Q   Faster than a walk?
6     A   Right.
7     Q   All right.  Do you recall what you said to him
8 the first time you talked?
9     A   No.  I -- No.  But I'm assuming I would have
10 been, you know, stop, police or something like that.
11    Q   When you first spoke to him did he react?
12        MR. MCGUIRE:  Objection.  Can you ask what
13 react -- what do you mean by react?  You can answer if you
14 can.
15    A   He might have stopped and turned or -- not
16 sure.
17    Q   (By Mr. Ryals) As you were speaking to him are
18 you continuing to close the gap between you and him?
19    A   Yes.
20    Q   You didn't stop and say something?  I mean you
21 just kept going forward, correct?
22    A   Yeah.
23    Q   All right.  At some point did he stop?
24    A   Yes.
25    Q   At some point did you put your hands on him?

Page 22

1  A   At some point I did when I put handcuffs on
2  him. I'm pretty sure I did.
3  Q   Okay. Did he stop before you put your hands
4  on him?
5  A   He stopped but I think he -- he stopped but he
6  took sort of a stance like he wanted to fight. It wasn't
7  a like I'm stopping so I can speak with you. It's sort of
8  I'm stopping because I'm upset or I'm angry or whatever.
9  Q   When did that happen, when did he stop?
10 A   Some time between the time when I yelled at
11 him or till I approached him. Somewhere in there he
12 stopped.
13 Q   Was it your perception that he heard you,
14 that's why he stopped?
15 A   Sure.
16 Q   Now, you said when he stopped he took some
17 sort of stance; is that correct?
18 A   Correct.
19 Q   Describe what -- what actions he took; what
20 his body looked like.
21 A   Just sort of a defensive stance like, you
22 know, sort of like, you know, ready to fight, you know,
23 sort of stance. A defensive stance.
24 Q   All right. Well, did he do something with his
25 hands?

Page 23

1  A   That's what I mean. He took sort of a
2  defensive stance. He put his hands up like --
3  Q   Like a boxer?
4  A   Right. Like I'm about to fight sort of a, you
5  know, wasn't that he turned around and put his hands down
6  and said, can I help you. It was just sort of like, you
7  know, just defensive stance.
8  Q   Is that the first time that you made eye
9  contact with him when he turned around?
10 A   Yes.
11 Q   Okay. And from your perception the first time
12 he made eye contact with you?
13 A   Correct.
14 Q   How far away from him were you when he turned
15 around and took this stance you described?
16 A   Probably six feet or so.
17 Q   Again, not close enough to touch?
18 A   Correct.
19 Q   If you reached out your arm?
20 A   Correct.
21 Q   How were you oriented as and -- Strike that.
22     At that point in time when he turned around is
23 it fair to say that he stopped walking?
24 A   Correct.
25 Q   And you did as well?

Page 24

1  A   I think I kept approaching him because I
2  needed to talk to him. So I'm pretty sure I started to
3  close that six foot gap there once he, you know, sort of
4  like, hey I need to talk to you sort of. I mean I have no
5  idea what I said to him at that time but I did close that
6  gap so I could speak with him, yeah.
7  Q   Okay. Did he say anything?
8  A   No, I don't remember him saying anything.
9  Q   Have you told me everything that you said to
10 him up to this point in the narrative?
11 A   Yeah. Like I said, I told him to stop and he
12 turned around and that was sort of it, yeah.
13 Q   Okay. Then after he turned around what
14 happened?
15 A   He turned around like I said, he took a
16 stance. I approached him to sort of talk to him and he
17 started swinging.
18 Q   Do I have the chronology, correct? I'm sorry
19 to pick at you about this but I want to understand what
20 happened, okay. And as I hear your testimony, you correct
21 me if I misunderstood what you're saying. You verbally
22 told him to stop. Some point after you tell him to stop he
23 stops?
24 A   Correct.
25 Q   Then he turns towards you and takes this

Page 25

1  stance you've described?
2  A   Correct.
3  Q   You continue to close the gap. You don't say
4  anything else, right? You personally?
5  A   No, I told you I said I'm not sure if I said
6  anything else to him.
7  Q   Oh, okay. All right. And then he doesn't say
8  anything to you?
9  A   No.
10 Q   He just starts swinging at you?
11 A   Correct.
12 Q   How close were you to him when he started
13 swinging?
14 A   Probably somewhere between two to three feet.
15 Q   Are there any witnesses to this event that
16 you're aware of?
17 A   Not that I'm aware of, no.
18 Q   How about Officer Kimble?
19 A   No, as far as I know Officer Kimble was still
20 back with the victim.
21 Q   From where Officer Kimble would have been
22 standing with the victim is it a straight shot down the
23 street to see what unfolded?
24 A   There's some trees there but I'm not sure if
25 it would have blocked her view at all. I'm not sure.

Page 26

1  Q  Okay. But it is a straight road and a
2  straight sidewalk; is that right?
3  A  Correct.
4  Q  Did you ever speak to her about whether she
5  witnessed what occurred?
6  A  No.
7  Q  Were there -- I'm going to jump ahead a
8  little. Did any other police officers arrive?
9  A  Later, yes.
10 Q  How much later?
11 A  I don't know. Once he was in handcuffs we
12 called for a cruiser and a supervisor so I don't know, six
13 minutes, eight minutes, something like that?
14 Q  It was your perception that the other officers
15 came because you called them; is that right?
16 A  Correct.
17 Q  As opposed to a citizen calling them?
18 A  Correct.
19 Q  Please describe how Mr. Rohrbough swung at
20 you.
21 A  Like punches basically.
22 Q  Jabs, roundhouses, upper cuts?
23 A  I'm not a boxer so you're talking over my head
24 there. They were swings, how's that. He was swinging at
25 me with a closed fist with his arms.

Page 27

1  Q  Did he strike you?
2  A  He might have connected once but I mean it
3  wasn't a, you know, or didn't hit me in the face or
4  something like that. So I'd say it might have been a
5  shoulder or something, I'm not sure.
6  Q  How many times did he swing at you?
7  A  Several.
8  Q  How many is several?
9  A  More than three, how's that? I mean somewhere
10 along there.
11 Q  Now, you already said you were in uniform; is
12 that correct?
13 A  Correct.
14 Q  Did you have your duty belt on?
15 A  Correct.
16 Q  The equipment on your duty belt at that time
17 was what?
18 A  We stripped -- I stripped my down for the
19 funeral so it was just my duty weapon, a pair of handcuffs.
20 That would have been it.
21 Q  Do you typically carry some sort of baton?
22 A  I have an ASP baton but I haven't carried it
23 in years. I have a stick sort of.
24 Q  City stick?
25 A  Right.

Page 28

1  Q  Is that what you typically carried was city
2  stick?
3  A  Uh-huh.
4  Q  Yes?
5  A  Yes.
6  Q  And I think I know when I use that term, city
7  stick, I think we're communicating but can you describe
8  what that is?
9  A  Mine's actually just a piece of -- it's not
10 bamboo it's just a -- it's a wood rod roughly two and half
11 feet long maybe.
12 Q  Does it have any other attachments to it --
13 A  No.
14 Q  -- like any brass pieces?
15 A  No.
16 Q  Or anything like that?
17 A  Nope. Just a -- it's a martial arts stick so
18 it's a -- there's nothing else to it. No inserts or
19 anything like that.
20 Q  Are you a martial artist?
21 A  No.
22 Q  And that's approved by your department to
23 carry?
24 A  Uh-huh.
25 Q  Yes?

Page 29

1  A  Yes.
2  Q  In any event, you didn't have that with you --
3  A  No.
4  Q  -- when this event occurred? All right. When
5  Mr -- when as you've described Mr. Rohrbough swung at you
6  several times, did you say anything to him?
7  A  I'm not sure.
8  Q  Did you do anything physically?
9  A  Before handcuffing him?
10 Q  Well, up to and including handcuffing him.
11 How did you react physically?
12 A  Well, when he started swinging at me I guess I
13 sort of backed up as much as I could. And then I had to at
14 some point in time grab him and force him to the ground and
15 put handcuffs on him.
16 Q  And is that what you did, you grabbed him
17 somehow?
18 A  Right.
19 Q  How did you grab him?
20 A  I probably got a hold of one of his arms, put
21 it behind his back, forced him to the ground. Just like
22 we're, you know, put him in handcuffs. That was it.
23 Q  How did you get him to the ground?
24 A  Once I got a hold of his arm to control him
25 and just push him to the ground.

Page 30

1  Q  Did you take any swings yourself?
2  A  No.
3  Q  When you first encountered Mr. Rohrbough did
4 he have any injuries that you noticed?
5  A  I don't know.
6  Q  After you handcuffed him did you notice any
7 injuries?
8  A  Not right away and not until, I guess, a few
9 minutes later I noticed he had like a laceration or
10 something either on his nose or on his cheek or something.
11  Q  You wrote a report about this?
12  A  Uh-huh.
13  Q  Do you have it with you?
14  A  Yes.
15  Q  You've been referring to it periodically as
16 you've been testifying?
17  A  No.  Earlier I looked through it.
18  Q  Okay.  I thought I saw you looking down at
19 your lap.
20  A  Oh, no, I was just playing with my phone
21 earlier.
22      (Whereupon, Plaintiff's Deposition Exhibits
23 Numbers One through Three were marked for identification.
24  Q  (By Mr. Ryals) Sir, I'm going to hand you
25 what's been marked for your deposition Exhibit One, show it

Page 31

1 to your counsel.  Please review that.
2  A  Okay.
3  Q  Do you recognize that document?
4  A  It's the police report.
5  Q  All right.  It's your police report, correct?
6  A  Correct.
7  Q  Prepared after and as a result of this
8 incident, this encounter you had with Mr. Rohrbough?
9  A  Correct.
10  Q  And I note the last page stapled to that is a
11 copy of a police report slash summons; is that right?
12  A  Correct.
13  Q  And is that a copy of Exhibit Three --
14  A  Okay.  Yes.
15  Q  -- is that correct?  Okay.  Now, when did you
16 write this report?
17  A  I'm assuming later on that day or the next
18 day.
19  Q  You don't recall?
20  A  No.
21  Q  Did you make any other written record of the
22 events that you're testifying about here today?
23  A  No.
24  Q  No notes?
25  A  No.

Page 32

1  Q  No memos to any supervisors?
2  A  No.
3  Q  Now, the procedure for preparing a report and
4 that would have been used to prepare this report is you
5 dictate the information; is that correct?
6  A  No, I type my own reports.
7  Q  I see.  Did you do that back in the Third
8 District?
9  A  Correct.
10  Q  Was this report approved?
11  A  Yes, it was.
12  Q  By who?
13  A  My supervisor.  Looks like Sergeant Haley.
14  Q  That was your patrol supervisor at the time in
15 the Third?
16  A  Yes.
17  Q  Okay.  You included pedigree information for
18 Clare Ellen Mazzucka; is that right?
19  A  Uh-huh, correct.
20  Q  Where did you get that from?
21  A  The victim.
22  Q  After you arrested Mr. Rohrbough?
23  A  Correct.
24  Q  Did she prepare any statement as to what
25 occurred?

Page 33

1  A  No, just a verbal statement that we received
2 from her on the scene, that was it.
3  Q  Why didn't you get her to write a statement
4 about what happened?
5  A  Normally on something like this we don't get a
6 written statement.
7  Q  Where I'm looking at on page two where it says
8 officers assault?
9  A  Uh-huh.
10  Q  And it says your disposition?
11  A  Uh-huh.
12  Q  And after the colon is the notation minor
13 injury?
14  A  Correct.
15  Q  Who does that refer to?
16  A  Myself.
17  Q  What injury did you have?
18  A  Whenever there's any kind of an assault or
19 resisting there has to be something in this field.  You
20 can't leave it blank.  So the lesser -- the lesser would be
21 a minor injury.
22  Q  Did you have any injury at all?
23  A  No, there really wasn't an injury.  Like I
24 said, he struck me but it wasn't considered an injury.
25  Q  Okay.  So that -- I understand the limits of

Page 34

1  whatever computer program you're using, but the truth is
2  there was no injury; is that accurate?
3      A   Correct.
4      Q   And then on page three you have all the
5  pedigree and other information about Mr. Rohrbough,
6  correct?
7      A   Correct.
8      Q   And there's an injury description there; is
9  that right?
10     A   Correct.
11     Q   And it says minor injury?
12     A   Correct.
13     Q   Now, when you put minor injury in that field
14 for Mr. Rohrbough did you mean no injury?
15     A   No, there's a minor injury.  He had a
16 laceration which is also described in the narrative.
17     Q   All right.  And you charged him based on the
18 report and then based on the summons that you issued --
19 strike that.
20         Did you issue this summons, police report
21 summons?
22     A   Yes.
23     Q   You filled it out and signed it?
24     A   Correct.
25     Q   And you charged him with general peace

Page 35

1  disturbance, correct?
2      A   Correct.  Individual peace disturbance.
3      Q   There seems to be an inconsistency between the
4  report and the summons; do you agree with me?
5      A   Yeah, I guess it was general.  I'm not sure
6  which one I charged him with.  It probably was general.
7      Q   You agree with me page three says individual
8  peace disturbance and the summons says general?
9      A   Correct.
10     Q   Can you -- Can you describe the difference
11 between those two types of charges?
12     A   General is just you're disturbing the peace of
13 everyone around you.  Individual is an individual who
14 you're disturbing that's person peace so that would have
15 been the victim.
16     Q   Right.  When you charged him with general
17 peace disturbance were you claiming that he disturbed
18 anyone's peace other than Ms. Mazzucka?
19     A   No, I'm assuming maybe this was just an error
20 on my part when I wrote the summons up.
21     Q   All right.  All I'm trying to get at is are
22 you alleging he disturbed anyone else's peace?
23     A   No.
24     Q   Okay.  And then you also charged him with
25 resisting arrest; is that right?

Page 36

1      A   Correct.
2      Q   And that was for his conduct in relation to
3  you?
4      A   Correct.
5      Q   At what point in the proceedings did you
6  inform Mr. Rohrbough that he was under arrest?
7      A   At the point he was under arrest?
8      Q   Yes, sir.  Did you ever say those words to
9  him?
10     A   No, I approached him to speak with him and he
11 began swinging at me and struck me.  At that point in time
12 he is under arrest.  I'm not going to tell him I'm putting
13 him under arrest while I'm fighting with him and trying to
14 put handcuffs on him.
15     Q   Okay.  So you didn't tell him that at that
16 time, correct?
17     A   Probably once I had him in handcuffs I told
18 him he was under arrest and read him his rights but, yeah,
19 I mean I'm not --
20     Q   Okay.  I guess -- I'm not trying to quarrel
21 with you.  I'm just trying to figure out what occurred.
22 And as I heard your testimony up until the point when you
23 say he started swinging at you, you never told him he was
24 under arrest?
25     A   No, because at that point in time he wasn't

Page 37

1  under arrest.
2      Q   Right.  Did you witness any other offenses
3  other than what you charged him with?
4      A   No.
5      Q   Is swinging at a police officer any kind of
6  assault?
7      A   Well, once he struck me, yeah, it's an
8  assault.
9      Q   You didn't charge with him assault, correct?
10     A   No, I charged him resisting arrest.
11     Q   Why didn't you charge him with assault?
12     A   Huh, I'm not sure.  I'm not sure why I didn't
13 charge him with the assault.
14     Q   I'm just looking through the narrative part of
15 your report and I don't see any reference to him actually
16 striking you.  Do I misread this?
17     A   No, you're not misreading it.
18     Q   You say he struck at you or your words, strike
19 at me with a closed fist but you don't say he landed a
20 blow, correct?
21     A   Correct.
22     Q   At some point during your encounter with
23 Mr. Rohrbough did Officer Kimble come to your location?
24     A   No.
25     Q   Sir, how much time elapsed from the time that

Page 38

1  Mr. Rohrbough turned and was facing you in a fighting -- or
2  in what you call a defensive stance or whatever term you
3  used, until the time he was in handcuffs on the ground?
4      A   I'm not sure.  Thirty seconds, a minute,
5  something like that.
6      Q   From the time that you determined you were
7  going to go after Mr. Rohrbough until you were within six
8  feet of him how much time elapsed?
9      A   Not sure.  A couple minutes, a minute. I'm not
10 sure.
11     Q   Prior to your -- you contacting with
12 Mr. Rohrbough did you have any information about his mental
13 status?
14     A   No.
15     Q   Did you have any perception of his mental
16 status when you approached him or after he turned to look
17 at you?
18     A   No.
19     Q   How about after he was in cuffs?
20     A   No.
21     Q   And your testimony is you struck no blows to
22 him?
23     A   Correct.
24         (Whereupon, Plaintiff's Deposition Exhibits
25 Numbers Four through Sixteen were marked for

Page 39

1  identification.)
2      Q   (By Mr. Ryals) Officer, I'm going to hand you
3  a stack of photographs that are numbered sequentially
4  Exhibits Four through Sixteen after I present them to your
5  counsel.  And ask you to take a look at those, please.
6      A   Okay.
7      Q   First of all, do you recognize each of those
8  photographs as depicting Kenneth Rohrbough?
9      A   It's been three years ago.  I think that's
10 him.
11     Q   I'm sorry, you think?
12     A   I think that's him.
13     Q   Okay.  Do any of those photographs depict how
14 Mr. Rohrbough looked prior to you having contact with him?
15     A   I couldn't tell you that.  Like I said, it was
16 so fast, I'm not sure.  The laceration I think to his --
17 his cheek was caused when I had to force him to the ground.
18 But other than that, that's it.
19     Q   When you make reference to the laceration to
20 his cheek, for example, if you look at Exhibit Fourteen,
21 does that photograph depict the laceration you were
22 referring to?
23     A   This sort of cut here, yeah.
24     Q   Below his left eye?
25     A   Correct.

Page 40

1      Q   That's what you're calling the laceration to
2  his cheek?
3      A   Yeah.
4      Q   And presumably his face hit the ground?
5      A   Correct.
6      Q   If you look at Exhibits Five and Fifteen would
7  you agree those appear to depict some sort of injury to the
8  right side of his head?
9      A   It does, yes.
10     Q   All right.
11         MR. MCGUIRE:  What exhibits were those?  I
12 didn't catch what you said.
13         MR. RYALS:  They are Fifteen and Five.
14         MR. MCGUIRE:  Thank you.
15     Q   (By Mr. Ryals) Did you observe that injury to
16 him at the scene?
17     A   No.
18     Q   Do you know how that was caused?
19     A   No.  Like I said, it might have been something
20 that was there prior to arresting him.
21     Q   You don't think it happened as a result of
22 your encounter with him?
23     A   No.
24     Q   After Mr. Rohrbough was in handcuffs I
25 presume -- I mean the picture I have in my head is that

Page 41

1  you've taken him to the ground and you've cuffed him behind
2  his back; is that correct?
3      A   Correct.
4      Q   So he'd be face down --
5      A   Correct.
6      Q   -- on the pavement?
7      A   Correct.
8      Q   And then after you got the cuffs secured what
9  did you do?
10     A   I sat him up and sat him on the curb.
11     Q   All right.  After you sat him up what did you
12 do?
13     A   I got on my cell phone and called for a
14 supervisor.
15     Q   All right.  And I think you testified before
16 up to this moment in time Officer Kimble is not by you?
17     A   Correct.
18     Q   It's just you and Mr. Rohrbough there?
19     A   Correct.
20     Q   Did she at any point during this event or the
21 events that followed immediately after did she come down
22 the sidewalk toward you?
23     A   She might have come down after EMS and the
24 supervisor and everybody else showed up.  But to my
25 knowledge she stayed with the victim most of the time.  She

Page 42

1  had to get all her information and go inside and handle
2  that part of the investigation.
3      Q   Okay.  Do you recall what supervisor showed
4  up?
5      A   Marilyn Mullins.
6      Q   Is she a supervisor in that particular
7  district?
8      A   Correct.
9      Q   Is that the First?
10     A   Fifth.
11     Q   Fifth.  Did you know her from before?
12     A   Yes.
13     Q   Who did you call exactly to get a supervisor?
14     A   Just our 911 dispatcher.
15     Q   All right.  Did you also ask for an ambulance?
16     A   Correct.
17     Q   Before you made reference to calling for the
18 cruiser?
19     A   Correct.
20     Q   Did you also call for the cruiser?
21     A   I'm pretty sure I did.  Normally if you have a
22 suspect you have to call -- or a prisoner you have to call
23 for a cruiser.
24     Q   All right.  Do you know if the cruiser?
25     A   I'm assuming it did.

Page 43

1      Q   When you called what did you tell the
2  operator?
3      A   I don't know.  I'm not sure.  I needed a
4  supervisor and I needed EMS.  I mean I don't know exactly
5  what I told her or.
6      Q   You would have told her that you're a police
7  officer, correct?
8      A   Correct.
9      Q   Okay.  I mean because you're calling on a
10 public line, right?
11     A   Well, I'm -- we have a direct number that goes
12 to our supervisor there, the public would not have access
13 to.  So if someone called it'd have to be a police officer
14 or a department employee?
15     Q   Okay.  All right.  Well, I misunderstood.  So
16 you called a private line?
17     A   Correct, to our dispatchers.
18     Q   Would you have identified anything about what
19 had occurred?  Like I've got a resisting or something like
20 that?
21     A   Probably, yeah.  I had some kind of event or
22 resisting or a prisoner or whatever I have, yeah.
23     Q   Other than Sergeant Mullins did any other
24 police officers arrive at the scene?
25     A   Two or three other police officers that came

Page 44

1  later from the Fifth District.  You know, they just came,
2  they always send an assist car, so, yeah.  I couldn't tell
3  you who they were.  I'm not familiar with most of the
4  officers in the Fifth District so.
5      Q   Did any of those officers have contact with
6  Mr. Rohrbough?
7      A   No.
8      Q   Based on your experience with the St. Louis
9  Metropolitan Police Department given your call to the
10 dispatcher there would have been a dispatch over the radio;
11 is that correct?
12     A   Correct.
13     Q   Which any officer monitoring that channel
14 could hear?
15     A   Correct.
16     Q   As opposed to a private call to the
17 supervisor, right?
18     A   Right.  I called a private line which is --
19 phone line, then she would have had to dispatch it to the
20 supervisor in the area, correct.
21     Q   All right.  And as part of the information
22 conveyed by the dispatcher to the supervisor which would be
23 heard by everyone who was monitoring that channel, she
24 would have advised what type of call it was; is that
25 correct?

Page 45

1      A   No, she just would have said an officer needs
2  a supervisor to respond to this location.  She doesn't have
3  to give the why.  She could just tell them that she needs
4  them to respond to that location.
5      Q   Okay.  Did you hear the radio dispatch?
6      A   No, I didn't have a radio.
7      Q   I think before you said it would have been
8  about six minutes?
9      A   I'm guessing.
10     Q   Is that your best estimate of time?
11     A   Sure.
12     Q   So what happened during that interval between
13 the time you called and the time the supervisor arrived?
14     A   Just waited for someone to show up.  That was
15 it.
16     Q   So Mr. Rohrbough is sitting on the curb,
17 correct?
18     A   Correct.
19     Q   You're standing by him?
20     A   Correct.
21     Q   Just waiting.  Any communication with Officer
22 Kimble during that interval?
23     A   No, because Officer Kimble would have been
24 inside with the victim getting all of her information.
25     Q   Do you think the supervisor was the first

Page 46

1  police officer to arrive?
2     A   I'm not sure.
3     Q   Why is it that you called a supervisor?
4     A   Well, whenever you have an incident you have
5  to call a supervisor.
6     Q   How are you defining incident? Any kind of
7  police contact or?
8     A   If there's police contact we have to put
9  handcuffs on somebody you have to contact a supervisor.
10    Q   Was Mr. Rohrbough transported from the scene?
11    A   Yes.
12    Q   Was he in custody?
13    A   Yes, at that time he was.
14    Q   When he was transported he remained in
15 custody?
16    A   Correct.
17    Q   Do you know where -- what mode was used to
18 convey him?
19    A   If I'm not mistaken we used EMS to transport
20 him.
21    Q   Went by ambulance?
22    A   Yes.
23    Q   To?
24    A   One of the hospitals we took him to.
25    Q   Were you involved in any way in the

Page 47

1  transportation of Mr. Rohrbough?
2     A   No. That would have been the Fifth District
3  probably sent an officer with EMS to go with him.
4     Q   Ride in the back or just follow?
5     A   Ride in the back. And then would have
6  probably followed.
7     Q   Did you go to the hospital?
8     A   I can't remember if I went to the hospital. I
9  don't think I did. I can't remember.
10    Q   Whenever you first contacted Sergeant Mullins
11 did you give her a report of what occurred?
12    A   Sure, yes.
13    Q   Just verbally?
14    A   Right.
15    Q   What, if anything, did she do at the scene? I
16 mean did she take command of the scene and direct what was
17 going to happen next?
18    A   Yeah, I mean it was basically just, you know,
19 well, when EMS gets here we'll transport and we'll do this.
20 Make sure you have the victim -- I mean just what
21 supervisors do. Make sure you have everything you need for
22 your report and that, you know, so suspect's transported
23 and all the paperwork is done correctly. That was it.
24    Q   All right. Was there a lot of blood at the
25 scene?

Page 48

1     A   There wasn't a lot of blood but I mean there
2  was some, yeah. I mean there was like nothing like a pool
3  of blood. I mean if anything it would have been on him and
4  probably on my shirt if anything.
5            (Whereupon, Plaintiff's Deposition Exhibit
6  Number Seventeen was marked for identification.)
7     Q   (By Mr. Ryals) That should be Exhibit
8  Seventeen, Officer. Do you recognize that as a photograph
9  of what appears to be some pavement and blood stains?
10    A   Okay.
11    Q   Do you agree with me that's what it looks
12 like?
13    A   Sure.
14    Q   Does that -- Does that blood stain comport
15 with your recollection of how much blood was on the ground?
16    A   I don't remember any blood being on the ground
17 but I probably wasn't really paying attention though also.
18 It wasn't like I was -- this wasn't a homicide so it wasn't
19 something where I'm looking for blood, looking for clues.
20 This was a resisting so, yeah, I don't know.
21    Q   Okay.
22    A   That could have been there, that could have
23 been from any where. I have no idea.
24    Q   Exhibit Four is what I would concede as a poor
25 qualify photograph but it appears to depict the back of

Page 49

1  someone's head, presumably Mr. Rohrbough would you agree?
2     A   (Witness indicated.)
3     Q   Okay. To the extent that that's attempting to
4  depict some injury on the back of his head, do you have any
5  explanation for how he was injured on the back of his head?
6     A   No.
7     Q   And then Exhibits Thirteen and Twelve depict
8  the lower portion, lower -- the legs of someone, presumably
9  Mr. Rohrbough and they show injury to a left knee; is that
10 correct?
11    A   Correct.
12    Q   Any of the actions or conduct of you and
13 Mr. Rohrbough that would explain those injuries?
14    A   That could have been from when he went to the
15 ground possibly.
16    Q   Officer, you have -- I think you've said that
17 Mr. Rohrbough didn't say anything to you at any time and I
18 just want to make sure the record's clear on that.
19    A   I'm saying I don't remember him saying
20 anything at any time.
21    Q   All right. Had he said something is that the
22 sort of fact that you would typically want to note in your
23 police report?
24    A   Sure. I mean if it was relevant to what had
25 occurred, yeah.

Page 50

1  Q   Well, for example, if he had cursed you or
2  something that's something we'd expect to find in the
3  police report; is that correct?
4  A   Correct.
5  Q   If he had made an admission that's something
6  you'd expect to find?
7  A   Correct.
8  Q   Do you recall encountering any other person
9  other than police officers, EMS people at the scene?
10 A   His sister. And his niece.
11 Q   Okay. And you make reference to that, right?
12 A   Correct.
13 Q   Her name you say is Marilyn Rohrbough,
14 correct?
15 A   Correct.
16 Q   And you said his niece was there as well?
17 A   It was -- lady said it was her daughter. So
18 I'm assuming if that's his sister then she would have been
19 his niece.
20 Q   You recall that now but I don't see it in the
21 report; is that right?
22 A   Okay. There was another lady with her that
23 she said was her daughter. I'm not --
24 Q   All I'm trying to get at, you didn't put that
25 in the report --

Page 51

1  A   No.
2  Q   -- but you recall it now?
3  A   Well, there were two women that got out of the
4  car. She said this was her daughter, whatever. If I'm not
5  mistaken she said it was her daughter.
6  Q   Did they arrive before or after the
7  supervisor?
8  A   Probably right after or a couple minutes
9  after.
10 Q   Okay. And then EMS arrived after the
11 supervisor as well?
12 A   Correct.
13 Q   Do you know why this woman who identified
14 herself as his sister came to the scene?
15 A   Well, when she came to the scene she was
16 driving down the street. And I guess she saw what was
17 going on and she pulled over.
18 Q   You certainly didn't summon her?
19 A   No.
20 Q   Nobody else to your knowledge?
21 A   No, she on her own while she was driving down
22 the street pulled over and got out of the car and she knew
23 exactly who he was and started talking with him.
24 Q   Did you hear the conversation between them?
25 A   All she kept telling him was to calm down.

Page 52

1  Q   Was he acting other than calmly?
2  A   He was fidgety. And she told him to calm down
3  and that's when she said, hey, you know, he's on
4  medication, you know, so.
5  Q   Anything else about his conduct that you
6  haven't described for me? And I know it's a broad
7  question. I don't mean to -- I want you to take your time.
8  But you've described him as walking away from you first?
9  A   Correct.
10 Q   Then turning and putting his hands up towards
11 you, right? Swinging, he gets taken to the ground then
12 he's sat on the curb. And while he's on the curb you say
13 he was fidgety, right?
14 A   Yeah, he was fidgety. Sort of moving around.
15 I mean from my understanding as far as his conduct. I mean
16 he wasn't, you know, trying to stand up. He wasn't, you
17 know, I mean he wasn't trying to, you know, I mean
18 Q   He wasn't spitting at you?
19 A   Right.
20 Q   Or kicking at you?
21 A   No, not at all. I mean he was -- he was
22 irritated. You know, he was like I said he was kind of
23 moving around and -- but I mean no, as far as like, you
24 know, he wasn't -- once he was in handcuffs he wasn't
25 violent, he wasn't, you know -- there was no more

Page 53

1  aggression. I mean he was just -- he sat there like I said
2  sort of irritated and bothered you could tell that, you
3  know, that he had to sit there. Like I said, he might have
4  said something every now and then but I mean it wasn't like
5  he was, you know, I can't remember him cursing directly at
6  me or anything like that, no.
7  Q   Sure. Did you observe the paramedics render
8  him aid?
9  A   I'm not sure. I might have been talking to
10 either the sergeant or trying to get some information then.
11 I'm not sure.
12 Q   All right. You reflect in your report he was
13 treated for a laceration to his face. Is that -- is that
14 something you saw with your own eyes or information you
15 picked up from other source?
16 A   Well, I mean that's the -- at the time I mean
17 they looked at the laceration I think -- I'm guessing that
18 EMS looked at the laceration on his face and then he was
19 transported. So to my knowledge the laceration on his face
20 is what he sustained during our struggle and that's what he
21 was treated for.
22 Q   Did you ever go inside the business to examine
23 that scene?
24 A   Man, did -- yes, I think I did go inside.
25 Q   What did you see?

Page 54

1  A   If I'm not mistaken there were sort of display
2  racks with frames on them that were all thrown over on the
3  floor and broken. If there was something else, I can't
4  remember. I do remember there was sort of a round plastic
5  display racks with frames that were sort of all thrown all
6  over the floor.
7  Q   Okay. I think when we started the deposition
8  you said that that would be a destruction of property
9  crime; is that correct?
10 A   Correct.
11 Q   He was not charged with any property crime; is
12 that right?
13 A   Correct.
14 Q   Why not?
15 A   If I'm not mistaken I think from the
16 supervisor on the scene said basically charge him with
17 this. I think that's what happened. We were sort of, you
18 know, I don't -- I truthfully can't remember if the racks
19 were broken or not or if they were just knocked over and,
20 you know. So and I think that might have been it, that
21 they actually weren't damaged they were just -- he just
22 threw them all over the place and they actually weren't
23 damaged so that's why we charged him with peace disturbance
24 instead of property damage because the racks actually
25 weren't broken or significantly damaged.

Page 55

1  Q   I see. Was the decision about what charges to
2  lodge against him your decision or someone else's?
3  A   I think I discussed them with the supervisor
4  on the scene. I mean normally that's what we do. We talk
5  to the supervisor and say, hey, this is what we got and we
6  sort of decide what charges at that time.
7  Q   All right. And I've got Exhibit Two here. Do
8  you recognize that document?
9  A   Correct, yes.
10 Q   What is it?
11 A   That's a warrant disposition.
12 Q   And did you fill that out?
13 A   Correct, I did.
14 Q   How is that -- For what purpose is that
15 document used?
16 A   This is to apply on warrants or -- when
17 someone is charged with a crime.
18 Q   Is that an application to the city counselor
19 or to the state prosecutor?
20 A   It's to the city counselor.
21 Q   And then explain to me the process. You fill
22 out this form, right?
23 A   Uh-huh.
24 Q   And then do you take the police report with
25 you and go see a city counselor?

Page 56

1  A   Correct.
2  Q   You sit down and talk to them about what
3  occurred, right?
4  A   Correct.
5  Q   And then there's a column that reflects the
6  disposition of the application for a warrant?
7  A   Correct.
8  Q   And let me take a step back. You issued a
9  summons to Mr. Rohrbough at the scene or at the hospital?
10 A   Correct. Well, I issued him one. I'm not
11 sure if I gave it to him at the scene or if I gave them to
12 him -- I think I gave it to him at the scene or I might
13 have written it out and someone delivered it to the
14 hospital to him. I'm not sure when he received it.
15 Q   Okay. That summons is not sufficient to go
16 forward with the prosecution; is that right? Because you
17 have to go talk to the prosecutor then about getting
18 warrants?
19 A   Correct.
20 Q   All right. So you present this form, this
21 exhibit -- Is it three?
22 A   Two.
23 Q   Two. And your report and then you can fill in
24 any gaps with your own account that might be in addition to
25 what you wrote in the report, right?

Page 57

1  A   Correct.
2  Q   And then the prosecutor based on all of that
3  information makes a decision about whether to prosecute or
4  not?
5      MR. MCGUIRE: Objection, leading question. But
6  you can answer if you can.
7  Q   (By Mr. Ryals) Is that right?
8  A   Correct.
9  Q   Okay. Does that form, Exhibit Two, reflect
10 the prosecutor's decisions about prosecution in this case?
11 A   I need to talk to Joe for a second.
12 Q   Sure.
13     (Whereupon, a brief recess was taken off the
14 record.)
15 A   No, it does not.
16 Q   (By Mr. Ryals) May I see that? There's a
17 column after the charge that says ISS REFTUA.
18 A   Right. Correct.
19 Q   And then there's a place for the circuit
20 attorney or city counselor to sign?
21 A   Correct.
22 Q   And after what I think is ND peace, I presume
23 that means peace disturbance?
24 A   Correct.
25 Q   It says, TUA?

Page 58

1  A  Correct.
2  Q  And then there's a signature to the right?
3  A  Correct.
4  Q  TUA stands for?
5  A  Taken under advisement.
6  Q  Okay. And then as to resisting there's a
7  indication REF which stands for what?
8  A  Refused.
9  Q  All right. And then a signature?
10 A  Correct.
11 Q  All right. Is that your signature?
12 A  No.
13 Q  Do you know who signed it?
14 A  I'm not sure.
15 Q  Do you know who wrote TUA?
16 A  Whatever city counselor we spoke with.
17 Q  So this document, your testimony is does not
18 reflect the decision about whether to charge or not?
19 A  No, the -- I asked the circuit -- the
20 prosecuting attorney not to because of his state. I said
21 he's a Vietnam vet, he's got some problems, we didn't find
22 this out until later on. She said not a problem. They
23 were going to actually issue the case.
24 Q  I see.
25 A  So that's why it was refused and TUA'd.

Page 59

1  Q  I see. At your request?
2  A  Right, at my request.
3  Q  These events occurred on September 3rd of
4  2002. Am I reading this form right, that you made
5  application on October 22nd of 2002?
6  A  That might have been 9/22, I'm not sure. I
7  think it's actually 9/22.
8  Q  It says 10/22 but you think --
9  A  Right, I think it was 9/22.
10 Q  If you look in the upper right hand corner it
11 says date of this report and also says --
12 A  No, I guess it was. Okay, it was 10/22.
13 Q  Can you explain why it took you nearly two
14 months to go apply?
15 A  No, not really. I mean we're doing real
16 police work. I mean we're doing search warrants and
17 federal grant programs so that wasn't --
18 Q  A high priority?
19 A  Right. It's not a high priority.
20 Q  Okay.
21 A  And like I said, once -- that day once we
22 spoke with his sister and she sort of told us what was
23 going on with him, like I said, I'm not going to jam a vet
24 up over something like this. So I'm like, hey, that's
25 fine. So it was no -- it wasn't like I had to hurry up and

Page 60

1  go down the next day to apply on it because I wanted to get
2  this guy jammed up over something like that. So it was
3  just with everything else going on I applied on it whenever
4  we had time.
5  Q  Okay. I want to make sure I understand your
6  testimony correctly. When you went up to him you never
7  touched him until he turned and faced you with this stance
8  like you described?
9  A  Correct.
10 Q  You didn't like tap him on the shoulder or
11 touch his back to get his attention?
12 A  No.
13 Q  Did you witness any other police officer put
14 his or her hands on him at all at any time?
15 A  No.
16 Q  And that would include you saw no other
17 officers strike him?
18 A  No. We're across the street from Crown Candy
19 I mean that's --
20 Q  What do you mean by that?
21 A  Never mind.
22    MR. MCGUIRE: Do you mind before you ask
23 another question if we take another break real quick?
24    MR. RYALS: Sure.
25    (Whereupon, a brief recess was taken off the

Page 61

1  record.)
2  Q  (By Mr. Ryals) Sir, do you recall ever getting
3  any training about approaches to dealing with people who
4  are mentally challenged or mentally disabled?
5  A  Yes.
6  Q  Do you recall anything about the substance of
7  that training, what you were taught?
8  A  Yes.
9  Q  Tell me what you remember about it.
10 A  We have different agencies we can contact if
11 we have someone that's mentally disturbed or -- I mean
12 there's other -- we have resources in case we need them.
13 Q  Anything about the interpersonal interaction
14 that you have --
15 A  Well, I wouldn't know this until after he was
16 handcuffed so it really wouldn't --
17 Q  Any training how to recognize if somebody is
18 mentally challenged or disable?
19 A  I'm pretty sure we did, yeah.
20 Q  Do you recall what you were instructed?
21 A  No, I don't remember.
22 Q  When you first laid eyes on Mr. Rohrbough or
23 at any time after that did you have the perception that he
24 didn't look normal?
25 A  Before he was handcuffed; is that what you're

16 (Pages 58 to 61)

Page 62

1  asking?
2  Q  Yes.
3  A  No.
4  Q  Have you ever been sued before this case?
5  A  I have one -- another lawsuit going now, yeah.
6  Q  Do you know who the plaintiff is?
7  A  No.
8  Q  Do you know where that's pending?
9  A  I'm sorry?
10 Q  Where is it filed? What court?
11 A  I'm assuming federal court.
12 Q  Do you know generally what the allegations
13 are?
14 A  I think it was a violation of civil rights.
15 Q  Factually what did they say happened?
16 A  We arrested some anarchists that were about to
17 hold a protest downtown. I'm sure you're familiar with
18 that.
19 Q  Did any part of your body strike -- Strike
20 that.
21    At the location where you were having the
22 physical event with Mr. Rohrbough it's a public sidewalk
23 with a wall that butts up against the sidewalk; is that
24 correct?
25 A  Correct.

Page 63

1  Q  Did you ever bump into the wall in the course
2  of this altercation?
3  A  I don't know.
4  Q  Did Mr. Rohrbough?
5  A  I don't know.
6  Q  Once you grabbed his arm -- I think you said
7  you grabbed his arm; is that correct?
8  A  Correct.
9  Q  Did he immediately go to the ground or was
10 there a struggle while you stood?
11 A  There's probably a slight struggle while we
12 stood to get him down on to the ground, yes.
13 Q  Did it happen very quickly once you got a hold
14 of his arm that he was on the ground?
15 A  Yeah, it wasn't like it was a long struggle.
16 It took probably a few seconds or so I guess to get him to
17 the ground, yeah.
18 Q  I mean you have to grab it and then you have
19 to actually get it behind him, right?
20 A  Correct.
21 Q  And then your body goes behind him, correct?
22 A  Correct.
23 Q  And then you apply pressure and he goes down?
24 A  Correct.
25 Q  That quick?

Page 64

1  A  Correct.
2  Q  And then once he was on the ground was there
3  any struggle in terms of getting him handcuffed?
4  A  No.
5  Q  All right. I've been told, and tell me if
6  this is accurate or not. I've been told by other police
7  officers that if somebody doesn't want to be cuffed then
8  one officer really can't accomplish it. In other words, a
9  person would be -- typically is capable of resisting
10 cuffing if you only have one officer doing it; is that your
11 experience?
12 A  No.
13 Q  Your experience --
14 A  I mean there's -- there's a lot of factors
15 that go into it. Size, male, female. I mean there's
16 different things that sort of come into play when you're
17 trying to handcuff somebody. If someone wanting to
18 handcuff if you can -- if you can get them on the ground
19 you can get one cuff on them you can usually get them
20 cuffed better so, yeah.
21 Q  Okay. All right.
22 A  Depends what kind of cuffs you use. I mean
23 there's things that come into play there.
24 Q  What are the different types of cuffs that you
25 might use?

Page 65

1  A  Well, if you're using a hinge cuff versus
2  chain cuff the hinge cuff is a lot easier to use because
3  you can put the cuff on without having to swivel the other
4  cuff around. I mean there's different things like that
5  that make handcuffing easier so.
6  Q  I see. The handcuffs that you were carrying
7  at the time, were those the type that could be double
8  locked?
9  A  Yes.
10 Q  Did you double lock them?
11 A  I'm not sure.
12 Q  Did you have the ability to? In other words,
13 if somebody's struggling with you it would be difficult to
14 double lock them; is that correct?
15 A  Well, once you have them handcuffed you could
16 double lock them. You don't have to double lock them when
17 you put them on. I mean you don't put them on and double
18 lock them at the same time. You can actually double lock
19 them once they're -- they're in handcuffs.
20 Q  Once they're attached?
21 A  Right.
22 Q  My point is, if they're still fighting with
23 you, still moving their hands it would be difficult to
24 double lock them; is that right?
25 A  Correct.

Case: 4:07-cv-00996-ERW   Doc. #: 39-2   Filed: 09/08/08   Page: 18 of 20 PageID #: 516

Page 66

1  Q  Was he doing any of that such that it would
2  prevent from double locking them?
3  A  No.
4  Q  Did he ever lose consciousness?
5  A  No.
6  Q  We've already established you were not on duty
7  but you were in uniform.
8  A  Correct.
9  Q  The fact that you were not on duty did not
10 affect your duty to respond to this; is that correct?
11 A  Correct.
12 Q  In the city you're on duty 24/7, you just
13 serve certain shifts; is that accurate?
14 A  Correct.
15 Q  When you started working in the weed and seed
16 program did you -- you said you would do search warrant
17 executions, correct?
18 A  Uh-huh.
19 Q  That's a fairly hazardous bit of police work;
20 is that fair to say?
21 A  Yes.
22 Q  I mean when you talk about executing search
23 warrants you're talking about kicking in doors and going in
24 houses?
25 A  Correct.

Page 67

1  Q  Did you receive any sort of specialized
2  training to do that work?
3  A  Things that we were taught in the academy and
4  some training from -- from one of the hostage team
5  commanders.
6  Q  On the job sort of training?
7  A  Correct.
8  Q  No CLE or continuing education classes you
9  attended?
10 A  No. And if they were high risk search
11 warrants our hostage team executed them for us anyway and
12 we just came in once they were done.
13 Q  Have you ever worked undercover?
14 A  Yes.
15 Q  Is that part of the weed and seed assignment?
16 A  No.
17 Q  The intelligence unit assignment?
18 A  In the asset forfeiture unit, yes.
19 Q  Your duty belt did not contain pepper spray on
20 that day?
21 A  No.
22 Q  Does it usually?
23 A  Yes.
24 Q  When you approached Mr. Rohrbough what was
25 your intention? I mean before you say that he took a swing

Page 68

1  at you what were you intending to do when you contacted
2  him?
3  A  To interview and find out his side of the
4  story what happened at the optometrist's office.
5  Q  Did you ever relinquish custody of
6  Mr. Rohrbough to anybody before he went with the EMS to the
7  hospital?
8  A  No.
9  Q  So he was in your custody?
10 A  Correct.
11 Q  And then?
12 A  The entire time.
13 Q  And that means you're responsible for his
14 safety?
15 A  Yes, sir.
16 Q  Did Officer Kimble provide any information
17 that went into the report?
18 A  Just the statement from the victim. That
19 would have been it.
20 Q  She related that to you as opposed to the
21 victim relating it to you?
22 A  Well, she gave it to me at the same time and
23 then I guess I spoke with the victim also.
24 Q  Is there ever a time on this occasion and did
25 you ask the victim whether she was desirous of prosecuting

Page 69

1  or not?
2  A  I'm pretty sure I did, yes.
3  Q  And you got an affirmative response?
4  A  Yes.
5  Q  So that's normal you would ask?
6  A  Yes.
7  Q  Sir, from the time you first parked your car
8  near Crown Candy Kitchen until you left the scene is there
9  anything that you said or did that you haven't already told
10 me about?
11     MR. MCGUIRE: Objection, over broad and vague
12 but you can answer if you can.
13 A  I have no idea.
14 Q  (By Mr. Ryals) You don't have any idea?
15 A  I can't remember what all I did that day so if
16 I don't remember I can't tell you.
17 Q  Okay. Is there any action or statement on the
18 part of Mr. Rohrbough that you haven't told me about?
19     MR. MCGUIRE: Same objection. Go ahead and
20 answer.
21 A  I can't remember. I don't know.
22     MR. RYALS: All right. That's all the
23 questions I have.
24     (Whereupon, Plaintiff's Deposition Exhibit
25 Number Eighteen was marked for identification.)

### Page 70

1  MR. MCGUIRE: He'll read and sign.
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

### Page 71

1         CERTIFICATE OF REPORTER
2      I, Pamela G. Williams, Certified Shorthand
3  Reporter, Notary Public within and for the State of
4  Missouri, do hereby certify that the witness whose
5  testimony appears in the foregoing deposition was duly
6  sworn by me; the testimony of said witness was taken by me
7  to the best of my ability and thereafter reduced to
8  typewriting under my direction; that I am neither counsel
9  for, related to, nor employed by any of the parties to the
10 action in which this deposition was taken, and further that
11 I am not a relative or employee of any attorney or counsel
12 employed by the parties thereto, nor financially or
13 otherwise interested in the outcome of the action.
14
15       _____
16          Notary Public within and for
17              the State of Missouri
18 My commission expires November 19, 2005.
19
20
21
22
23
24
25

### Page 72

1                COURT MEMO
   IN THE CIRCUIT COURT OF THE CITY OF ST. LOUIS
2             STATE OF MISSOURI
3  KENNETH ROHRBOUGH,       )
      vs.                   ) Cause No.
4  P.O. LUTHER HALL, JR, et al.   ) 042-08044
5         CERTIFICATE OF OFFICER AND
          STATEMENT OF DEPOSITION CHARGES
6   (Rule 57.03 (g) (2) (a) & Sec., 492.590 RSMO 1985.)
7        DEPOSITION OF LUTHER HALL, JR.
         TAKEN ON BEHALF OF THE PLAINTIFF
8              OCTOBER 12, 2005
9  Name and address of person or firm having custody of
   the original transcript: Mr. Stephen Ryals, 8008
10 Carondelet, Suite 205, St. Louis, Missouri 63105.
11 TAXED IN FAVOR OF: Mr. Stephen Ryals
          TOTAL................$_____
12
          Mr. Joseph T. McGuire
13        TOTAL................$_____
14
   Upon delivery of transcript, the above charges had
15 not yet been paid. It is required that all charges
   will be paid in the normal course of business.
16
         MIDWEST LITIGATION SERVICES
17         711 North Eleventh Street
             St. Louis, MO  63101
18
   IN WITNESS WHEREOF, I have hereunto set my hand and
19 seal on this 27th day of October, 2005.
            My Commission expires
20  _____.
21         NOTARY PUBLIC
22
23
24
25

### Page 73

1  I, LUTHER HALL, JR, do hereby certify:
2       That I have read the foregoing deposition;
3       That I have made such changes in form and/or
4  substance to the within deposition as might be necessary to
5  render the same true and correct;
6       That having made such changes thereon, I
7  hereby subscribe my name to the deposition.
8       I declare under penalty of perjury that the
9  foregoing is true and correct.
10
11      Executed the _____ day of _____,
12 20___, at _____.
13
14      _____.
15         LUTHER HALL, JR.
16
17 My Commission Expires: _____
18 Notary Public:         _____
19 SP/Luther Hall, Jr.
   Kenneth Rohrbough vs. Luther Hall, Jr, et al.
20
21
22
23
24
25

Page 74

```
 1        Errata Sheet
 2   Witness:  Luther Hall, Jr.
 3   In Re:  Kenneth Rohrbough vs. Luther Hall, Jr.
 4   Upon reading the deposition and before subscribing thereto,
     the deponent indicated the following changes should be
 5   made:
 6   Page    Line   Should read:
     Reason assigned for change :
 7
     Page    Line   Should read:
 8   Reason assigned for change :
 9   Page    Line   Should read:
     Reason assigned for change :
10
     Page    Line   Should read:
11   Reason assigned for change :
12   Page    Line   Should read:
     Reason assigned for change :
13
     Page    Line   Should read:
14   Reason assigned for change :
15   Page    Line   Should read:
     Reason assigned for change :
16
     Page    Line   Should read:
17   Reason assigned for change :
18   Page    Line   Should read:
     Reason assigned for change :
19
     Page    Line   Should read:
20   Reason assigned for change :
21   Page    Line   Should read:
     Reason assigned for change :
22
     Reporter:  Pamela G. Williams
23
24
25
```

Page 75

```
 1         Midwest Litigation Services
              711 North Eleventh Street
 2             St. Louis, Missouri  63101
 3       Phone (314) 644-2191  *  Fax (314) 644-1334
 4              October 27, 2005
 5   Mr. Joseph T. McGuire
     Assistant Attorney General
 6   720 Olive Street, Suite 2150
     St. Louis, Missouri 63101
 7
 8   In Re:  Kenneth Rohrbough vs. Luther Hall, Jr, et al.
 9
     Dear Mr. McGuire:
10
     Please find enclosed your copy of the deposition of
11   Officer Luther Hall, Jr, taken on October 12, 2005 in the
     above-referenced case.  Also enclosed is the original
12   signature page and errata sheets.
13   Please have the witness read your copy of the
     transcript, indicate any changes and/or corrections
14   desired on the errata sheets, and sign the signature
     page before a notary public.
15
     Please return the errata sheets and notarized signature
16   page to Mr. Stephen Ryals for filing prior to trial date.
17   Thank you for your attention to this matter.
18   Sincerely,
19
20   Pamela G. Williams
21   CC:  Mr. Stephen Ryals
22          .
23
24
25
```